# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 98-CA-00507-SCT

*JOHN CONLEY*

*v.*

*EDWARD WARREN, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/1998 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL T. LEWIS |
| | HOLLAMAN MARTIN RANEY |
| ATTORNEYS FOR APPELLEE: | STEPHEN P. KRUGER |
| | JAN F. GADOW |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 02/15/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/8/2001 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. John Conley filed this negligence suit against Dr. Edward Warren for injuries allegedly resulting from surgery to repair Conley's thoracic aorta. The trial court granted Warren's summary judgment motion and held that the physician, employed by the University of Mississippi Medical Center, was immune under the Mississippi Tort Claims Act, (MTCA), Miss. Code Ann. §§ 11-46-1 to -23 (Supp. 2000). Aggrieved by the trial court's decision, Conley appeals to this Court.

## FACTS

¶2. On May 30, 1993, John Conley was injured in an automobile accident and transported to the University of Mississippi Medical Center. The day after Conley's accident, Dr. Edward Warren, a cardiovascular surgeon on staff, performed an operation to repair Conley's thoracic aorta. Conley alleges that after the accident but prior to the May 31 surgery, he could move his legs. After the surgery he was paralyzed from the waist down. He filed suit against Warren on May 28, 1995, in the Circuit Court of the First Judicial District of Hinds County asserting that Warren was negligent in performing the surgery.

¶3. Warren was an associate professor at the University of Mississippi School of Medicine. He designated Dr. Richard Miller, Associate Dean at the university, to testify as to the terms of Warren's employment contract with the Board of Trustees of the State Institutions of Higher Learning. Under the terms of this contract, Warren earned a base salary and was permitted to collect fees to a certain amount beyond that salary before being required to split fees with the hospital.

¶4. According to Miller, Warren was the chief surgeon attending Conley's operation but was simultaneously

acting as an associate professor teaching the resident who was present. As the attending physician for Conley's operation, Warren made all of the decisions as to procedure and technique.

¶5. Warren filed a motion for summary judgment on the grounds that Conley had failed to comply with the notice provisions of Miss. Code Ann. § 11-46-11. Warren also asserted that the statute of limitations had run since Conley filed the lawsuit in excess of one year after the claim had accrued. The trial court held that Warren's contract with UMC established him as a state employee, not an independent contractor, and that he was, therefore, immune under the Tort Claims Act. The trial court granted summary judgment in favor of Warren. Aggrieved by the trial court's decision, Conley timely perfected this appeal.

## STANDARD OF REVIEW

¶6. A grant of summary judgment is reviewed de novo. *Gross v. Chevrolet Country, Inc.*, 655 So. 2d 873, 877 (Miss. 1995). The evidence is viewed in the light most favorable to the non-moving party. *Turner v. Johnson*, 498 So. 2d 389, 390 (Miss. 1986). If any triable issues of fact exist, the trial court's grant of a summary judgment will be reversed; otherwise the decision will be affirmed. *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1983).

## ANALYSIS

### I. WHETHER DR. WARREN WAS AN INDEPENDENT CONTRACTOR UNDER CONTRACT TO THE STATE WITHIN THE MEANING OF MISS. CODE ANN. § 11-46-1(f).

¶7. The trial court granted summary judgment on February 19, 1998. Since that time we have decided *Miller v. Meeks*, 762 So. 2d 302 (Miss. 2000), and *Smith v. Braden*, 765 So. 2d 546 (Miss. 2000). Both cases deal with the same situation presented here. "The specific issue to be determined [in *Miller* was] whether faculty physicians of UMMC who engage in clinical outpatient practice under the general auspices of the University, for which they are compensated, are state employees acting within the course and scope of their employment for purposes of the MTCA." *Miller*, 762 So. 2d at 309.

¶8. Finding that "the traditional scope of employment analysis fails to provide sufficient guidance to the bench and bar on this issue," we looked to our sister state, Virginia, for guidance. *Id.* at 310. In *James v. Jane*, 282 S.E.2d 864 (Va. 1980), the Virginia Supreme Court examined the issue of whether faculty physicians employed by the University of Virginia Medical Center were protected by sovereign immunity for acts of simple negligence. The court developed a four-part test to determine the status of these hybrid physicians. The following criteria were established:

    1. the nature of the function performed by the employee;

    2. the extent of the state's interest and involvement in the function;

    3. the degree of control and direction exercised by the state over the employee; and

    4. whether the act complained of involved the use of judgment and discretion.

¶9. In adopting this Virginia test in *Miller*, we found the need to add one other criterion to the list. We held that the means of compensation should be considered as well. *Miller*, 762 So. 2d at 310. Therefore, the

test adopted in *Miller* and subsequently applied in *Smith* and now here is to weigh the following factors:

1. the nature of the function performed by the employee;

2. the extent of the state's interest and involvement in the function;

3. the degree of control and direction exercised by the state over the employee;

4. whether the act complained of involved the use of judgment and discretion; and

5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.

¶10. A full and meaningful application of these factors is currently not possible on the record before us. The trial court is in a better position to adequately examine the facts and issues of this case since it is not limited by the underdeveloped record which is before this Court. Therefore, we remand and instruct the trial court to weigh the factors.

¶11. If Warren acted as an independent contractor in the treatment of his patient, Conley, he is not entitled to the protection of the Tort Claims Act inasmuch as Miss. Code Ann. § 11-46-1(f) explicitly excludes independent contractors from its provisions. *Owens v. Thomae*, 759 So. 2d 1117, 1122 (Miss. 1999). One who engages an independent contractor is not responsible for torts committed by the contractor. *See, e.g.*, *Branning v. Hinds Community College Dist.*, 743 So. 2d 311, 318 (Miss. 1999); *Richardson v. APAC-Miss., Inc.*, 631 So. 2d 143, 149 (Miss. 1994); *Blackmon v. Payne*, 510 So. 2d 483, 488 (Miss. 1987).

### II. WHETHER THE TRIAL COURT PROPERLY DETERMINED THAT THERE WAS NO GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER DR. WARREN WAS SERVING IN A DUAL CAPACITY IN THE OPERATING ROOM-ONE AS A TEACHER AND ONE AS AN ATTENDING PHYSICIAN.

¶12. Conley asserts that Warren acted in a dual capacity and was in the operating room as both an attending physician and an instructor. We cannot say that there are no genuine issues of material fact regarding whether Warren was acting as a UMMC professor or in the capacity of a private doctor engaged in private practice when he treated Conley. The trial court's application of the above five-part test will determine the role Warren played during Conley's surgery.

### III. WHETHER THE CIRCUIT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DR. WARREN BASED ON THE TORT CLAIMS ACT.

¶13. The trial court erroneously granted Warren's summary judgment motion. Under the *Miller* test, triable issues of fact may exist. "[T]he summary judgment procedure . . . cannot be used to deprive a litigant of a full trial of genuine fact issues." Miss. R. Civ. P. 56 cmt.

### CONCLUSION

¶14. For the foregoing reasons, we reverse the trial court's grant of Dr. Warren's summary judgment motion and remand this case to the Hinds County Circuit Court for further proceedings consistent with this opinion.

¶15. **REVERSED AND REMANDED.**

**PITTMAN, C.J., BANKS, P.J., SMITH, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶16. The majority reverses and remands all issues in this case for determination by the trial court due to the "underdeveloped" record on appeal, but provides no guidance as to what evidence will yield the crucial proof that the majority lacks today. This matter is on appeal from a summary judgment, which we review de novo. *Gross v. Chevrolet Country, Inc.*, 655 So.2d 873, 877 (Miss. 1995). As discussed below, the evidence in the record is sufficient to apply the five-part test for employment status and to find that Dr. Warren was acting as an independent contractor while performing surgery on Conley. During the procedure, Warren was also acting as a professor, simultaneously instructing a resident, and was therefore acting in a dual capacity as both a physician and as a professor when treating Conley. I, therefore, agree to reverse. However, we should remand for a trial, not further consideration of the motion for summary judgment. Accordingly, I concur in part and dissent in part.

¶17. We recently delineated a five-part test to be used to determine employment status. *Miller v. Meeks*, 762 So.2d 302 (Miss. 2000). To differentiate between independent contractors and employees, the following factors should be considered: 1) the nature of the function performed by the employee, 2) the extent of the state's interest and involvement in the function, 3) the degree of control and direction exercised by the state over the employee, 4) whether the act complained of involved the use of judgment and discretion, and 5) whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.[1]

¶18. Applying these criteria to the facts before us, it is clear that Dr. Warren was acting as an independent contractor when he performed surgery on Conley:

### 1. The Nature of The Function Performed by The Employee

¶19. Both parties agree that Dr. Warren is a member of the faculty at UMC. He had two roles while working at UMC, one of which was that of an associate professor. Warren was also the surgeon who was operating on Conley at the time of the alleged negligence. His primary function, vis-a-vis Conley, was to provide medical treatment. It is true that he was also a member of the faculty at UMC at the time and instructed a resident throughout the procedure. However, since the alleged negligent act was one concerning his medical duties to Conley, rather than his teaching duties to the state, his primary function was as a doctor providing medical care to Conley as a patient.

### 2. The Extent of the State's Interest and Involvement in the Function

¶20. While the state may have some interest in training medical students and running a medical school, that interest does not outweigh its interest and duty in ensuring the health, safety and well-being of its citizens when it offers these services and charges for them. To say otherwise would make the students' lessons more important than the patients' recovery. These patients are not mere guinea pigs for apprentice

physicians, they are real, living people with the same real problems as patients in non-state-funded hospitals. The state's primary interest and obligation in operating these hospitals is no different than the obligation of any other hospital, i.e., to treat and work toward the recovery of the patients. The Virginia Supreme Court, the progenitor of most of this test, also addressed this point in *Lohr v. Larsen*, 431 S.E.2d 642 (Va. 1993), wherein it held:

> In *James*, "the paramount interest of the Commonwealth of Virginia [was] that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors." *Id.* at 54, 282 S.E.2d at 870. **But the allegedly negligent acts of the *James* physicians were not undertaken in furtherance of the Commonwealth's interest in providing medical education. And we indicated that although the Commonwealth had the same interest and concern in treatment of the private patients in *James* which it had in the treatment of every patient treated in the Commonwealth, the Commonwealth's interest and control over the *James* physicians was "slight." Id. In later cases, we characterized the function of those physicians as that of "independent contractors," *Messina v. Burden*, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984), and "essentially private practitioners," *Bowers v. Commonwealth*, 225 Va. 245, 252, 302 S.E.2d 511, 515 (1983).**

431 S.E.2d at 644 (emphasis added).

¶21. Additionally, allowing faculty physicians at UMC to form practice groups, partnerships, and basically engage in the corporate practice of medicine benefits the physicians significantly, but the advantage to the state and its citizens is only slight. The state has very little interest, if any, in shielding these physicians working at state healthcare institutions from liability beyond that enjoyed by others in the profession.

¶22. Furthermore, the mere possibility that insurance premiums could increase if the plaintiff is allowed recovery for the damages he has suffered cannot outweigh the state's interest in ensuring his right to pursue his medical malpractice action and hold negligent physicians accountable. The Virginia Supreme Court also realized this interpretation was possible and addressed such misconceptions, holding:

> [W]e were emphasizing the nature of the physician-patient relationship and the special undertaking, arising from that relationship, to use reasonable care. Implicit in the statement is the recognition that the state has a greater interest in preserving a patient's right to pursue a malpractice claim against a physician than in the amount of liability premiums the physician might have to pay.

*Bowers v. Commonwealth*, 302 S.E.2d 511, 515 (Va. 1983).

¶23. The value of a single Mississippi citizen's right to recovery outweighs the state's interest in reducing insurance costs.

### 3. The Degree of Control and Direction Exercised by the State over the Employee

¶24. The state may have provided the opportunity to treat Conley, but once the treatment was initiated, Dr.Warren's discretion supplanted the state's control over his medical decisions. Doctors, unlike laborers, must exercise their independent, professional judgment without interference from others.

¶25. The Hippocratic Oath requires that the physician " use (his) power to help the sick to the best of (his) ability and judgment." Section 6 of the American Medical Association's "Principles of Medical Ethics" states, "A physician should not dispose of his services under terms or conditions which tend to interfere with or impair the free and complete exercise of his medical judgment and skill . . . ." This point was also addressed in ***Bowers***, again specifically referencing the language in the ***James*** test,

> We said that, while the doctors' state employment made possible the arrangement whereby they undertook to treat patients, "the relationship [became] the personal and confidential one of doctor and patient, not the Commonwealth of Virginia and patient."221 Va. at 50, 282 S.E.2d at 867. In the doctor-patient relationship, we stated, "**the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice**."*Id.*

***Bowers***, 302 S.E.2d at 515 (emphasis added).

¶26. As we noted earlier, Warren argued that the state controlled many aspects of his practice, but none of those restrictions governed the actions which could have ultimately caused the alleged negligence. The control of the state over Dr. Warren's actions in the operating room is minuscule at most. It was his independent judgment or discretion that controlled his actions. This factor therefore weighs heavily in favor of finding him to be an independent contractor.

### 4. Whether the Act Complained of Involved the Use of Judgment and Discretion

¶27. This refers to both governmental discretion and medical discretion. Warren was not exercising any governmental discretion at the time of the alleged negligence, but rather, as noted above, he was using his sole medical judgment to evaluate and treat Conley. We addressed a similar issue regarding governmental discretion and sovereign immunity in ***Womble v. Singing River Hosp.***, 618 So.2d 1252 (Miss. 1993). In ***Womble***, we cited ***Henderson v. Bluemink***, 511 F.2d 399 (D.C. Cir. 1974), for the proposition that <u>governmental immunity was created to protect flawed administrative decisions, not medical malpractice</u>.

> [Immunity] is not applicable to the exercise of normal medical discretion since doctors making such judgments would face the same liability outside of government as they would face if the complaint below is upheld. [Therefore], the threat of liability for negligence would not deter the fearless exercise of medical discretion within government service any more than the same threat deters the exercise of medical discretion outside of government.

***Womble***, 618 So.2d at 1264.

¶28. The Georgia Supreme Court also addressed this issue in ***Kennan v. Plouffe***, 482 S.E.2d 253 (Ga. 1997). That court focused on the decisions of the physician and distinguished his independent medical judgment as a healer from the governmental discretionary tasks of an administrator:

> First, although it could be argued that Dr. Plouffe was in the broadest sense acting within the scope of his employment because he had an obligation as a professor at the medical college to treat patients, **he had distinct obligations to Ms. Keenan that were independent of his official state duties, and the duties he is alleged to have violated in this case relate solely to those independent obligations . . . . Therefore, significantly, the duties alleged to have been violated in this**

**case relate strictly to the medical care provided to Ms. Keenan and do not call into play what might be termed "governmental considerations,"** such as the allocation of state resources for various types of medical care. Furthermore, **Dr. Plouffe's primary duties in providing care to Ms. Keenan were to her and not to the State of Georgia**.

*Id*. at 255 (emphasis added).

¶29. Though Dr. Warren was instructing a resident during the operation, his primary function was the treatment of his patient using his sole medical discretion. His primary duties were to his patient, not the State of Mississippi. His actions in treating Conley were not in furtherance of any state policy nor were they under the "control" of UMC, but were rather the result of his medical judgments made pursuant to his doctor-patient relationship with Conley.

### 5. Whether The Physician Receives Compensation, Either Directly or Indirectly, From The Patient For Professional Services Rendered.

¶30. Finally, there is an abundance of evidence in the record which indicates that Dr. Warren received compensation from patients, either directly or indirectly. The detailed formulae for calculating Warren's income and Dr. Miller's testimony explaining how the bills for Warren's services are sent directly from Warren's office rather than the hospital both weigh heavily in favor of finding him to be an independent contractor under this factor.

¶31. Under the five-part test promulgated by this Court in *Miller*, Dr. Warren's actions were clearly those of an independent contractor. It was his medical discretion that was at issue and not an administrative decision. The record contains substantial evidence to support this finding. Because the alleged negligent acts at issue were committed while Warren was acting in his role as an independent contractor, he is not entitled to immunity under Miss. Code Ann. § 11-46-1(f) (Supp. 2000).

¶32. Since we review motions for summary judgment de novo, we should reverse the summary judgment and remand this case for trial, after having determined that Warren was acting in a dual capacity. He was primarily performing a duty as a doctor to his patient that meets all of the criteria necessary for him to be classified as an independent contractor under the test adopted by this Court in *Miller*. Accordingly, I concur in the reversal of the summary judgment but I dissent from the remand to the trial court for further consideration of the summary judgment motion under the *Miller* test.

1. We added this factor to what was a four-part test, and it should not be considered dispositive of the other four. An example of why it should be subordinate to the other four factors could be a situation where a hospital employs a nurse anaesthetist rather than an anaesthesiologist. Both could perform the same negligent act, but only the anaesthesiologist would have the ability to bill separately for his services. Are we to say that the nurse, who is an employee and less qualified than the doctor, is immune and that the doctor, as an independent contractor, is not immune? The results of applying this new factor could therefore run contrary to the main thrust of the test, which is to determine whether the defendant was treating a patient or doing some administrative act.